UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

WAYNE HANDSCHUH, SR.,

                              Plaintiff,

        v.                                         No. 04-cv-0764

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THOMAS J. McAVOY
Senior United States District Judge

## DECISION and ORDER

        Wayne Handschuh, Sr., ("Plaintiff") brought this suit under section 205(g) of the

Social Security Act ("Act"), as amended, 42 U.S.C. section 405(g), to review a final

determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's

application for disability insurance benefits.  Presently before the Court are the parties'

motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure.

I.      FACTS

        A. Procedural History

        Plaintiff applied for Social Security Disability ("SSD") benefits on February 16, 1999.

On May 20, 1999, the application was denied.  Reconsideration was denied on October 20,

1999.  On December 20, 1999, Plaintiff requested a hearing before an Administrative Law

Judge ("ALJ").  A hearing was held on May 8, 2000 before ALJ Robert Wright.  In a decision

dated September 26, 2000, the ALJ found that, although Plaintiff suffered from a severe

mental impairment secondary to post-traumatic stress disorder ("PTSD"), such a condition

failed to meet the requisite level of severity and would not prevent Plaintiff from performing

his past relevant work.  The Appeals Council denied Plaintiff's request for review of the ALJ's

decision on May 16, 2003, and that decision became the final determination of the

Commissioner.

Plaintiff then commenced the present action seeking review of the Commissioner's

decision.

### B. Medical History

Plaintiff was born on May 11, 1954, attended high school through the tenth grade,

and received a GED.  Tr. at 58, 111.[1]  He has not worked since October 1, 1997.  Tr. at 60.

Prior to October 1997, Plaintiff worked in maintenance, in sales, and as a security guard.  Tr.

at 59–60, 106.

Plaintiff tested positive for tuberculosis ("TB") infection[2] in February 1995, and

again in April 1995.[3]  Tr. at 40, 167, 177.  Following his PPD[4] conversion, Plaintiff was

evaluated on October 4, 1995, by Simon D. Spivack, M.D., a member of the Pulmonary and

Critical Care Medicine Division at Albany Medical College.  Tr. at 166.  Dr. Spivack

---

[1]"Tr." refers to the administrative record filed by the Commissioner.

[2]TB is an infectious disease that most commonly affects the respiratory system.  See Taber's Cyclopedic Medical Dictionary ("Taber's"), 1785, 15th ed. 1985.

[3]Plaintiff alleges he was infected by residents of Ten Broek Commons Nursing Home ("Ten Broek"), where he worked as a maintenance worker.  Tr. at 144.  Shortly after testing positive for TB infection, Plaintiff was forced to resign from his position at Ten Broek due to cutbacks.  Tr. at 106, 144.

[4]Purified protein derivative, or PPD, is a soluble cell substance prepared from the TB-causing tubercle bacillus, which is used to determine whether a human has been infected.  See Taber's at 1361, 1784.

hypothesized that Plaintiff became infected during his employment as a maintenance worker at Ten Broek.  Tr. at 148, 166.  Plaintiff showed no signs or symptoms of infection and had a normal chest x-ray.  Tr. at 148.  Dr. Spivack concluded that the prognosis for Plaintiff was "extremely good" and that he should not be deterred from seeking any work he was otherwise capable of performing.  Tr. at 166.  Dr. Spivack's attempts to treat the TB, first with INH and second with Rifampin,[5] were proven futile by Plaintiff's intolerance to the medication and its adverse effects.  Tr. at 148.

In October 1997, Dr. Spivack saw Plaintiff for complaints of depression and sexual dysfunction.  Tr. at 148.  Dr. Spivack referred Plaintiff to psychological counseling.  Id.  On April 7, 1999, Dr. Spivack reported, "depression is a major problem here."  Tr. at 155.  Dr. Spivack diagnosed Plaintiff with clinical TB and mild acute bronchitis.[6]  However, Dr. Spivack concluded that Plaintiff's pulmonary prognosis was excellent and there were no definite, documented, or chronic disabling pulmonary limitations.  Dr. Spivack believed there to be "a considerable psychological overlay" to Plaintiff's intolerance to medication and decline in social status.  Tr. at 149, 151–53.

On December 16, 1997, Plaintiff began seeing Streamson T. Chua, M.D., for psychological evaluation.  Tr. at 144.  During this evaluation, Dr. Chua noted a causal relationship between Plaintiff's loss of employment and onset of depression.  Tr. at 144.

---

[5]INH or isoniazid, an antibacterial, and Rifampin, an antibiotic, are both primarily used to treat TB infection.  See Taber's at 881, 1499.

[6]Acute bronchitis is a short, severe course of inflammation of the mucous membrane of the bronchial tubes, characterized by chilliness, malaise, soreness and constriction behind the sternum, coughing, and slight fever.  Typically, the cough is at first dry and painful and is followed by expulsion of mucus and pus from the throat or lungs that becomes free as the inflammation subsides.  See Taber's at 236.

According to Dr. Chua's notes, Plaintiff was "totally preoccupied" with the circumstances surrounding the loss of his job as well as the suspected cause of his TB infection.  Tr. at 144. Dr. Chua found Plaintiff nervous, irritable, sexually dejected, unable to concentrate, and episodically tearful.  Tr. at 144–45.  Dr. Chua further reported that Plaintiff had no hobbies, and had friends but did not want to see them.  Instead, Plaintiff spent his days watching television, occasionally cleaning the house.  Tr. at 145.  Dr. Chua emphasized Plaintiff's frustrated and angry preoccupation with the manner in which "he was cheated and forced to resign from his job," blaming it for ruining his health and happiness.  Tr. at 145.  However, Dr. Chua found Plaintiff "well oriented" with good memory, unimpaired judgment and insight, and spontaneous and coherent speech.  Tr. at 145.  Nevertheless, Dr. Chua diagnosed Plaintiff with chronic post-traumatic stress disorder ("PTSD"), having assessed a GAF of 31 based on Plaintiff's unemployment and marital problems.[7]  Dr. Chua recommended weekly individual psychotherapy sessions and prescribed Wellbutrin, an antidepressant.  Tr. at 145.

The record shows that Plaintiff proceeded to meet with Dr. Chua almost every week for the following two months.  Tr. at 162.  Although Dr. Chua noticed some progress–finding Plaintiff "less depressed and more talkative"–he still found Plaintiff preoccupied with and angry about the circumstances surrounding his TB infection and unemployment.  Tr. at 162. Dr. Chua increased the dosage on the prescribed Wellbutrin.  Tr. at 162.  In subsequent

---

[7]The Global Assessment of Functioning, or GAF, represents a clinician's subjective determination of an individual's overall level of functioning according to a 100-point scale, whereby an individual's psychological, social, and occupational functioning are taken into account.  A GAF of 31–40 indicates some impairment in reality testing or communication, or major impairment in several areas, such as work or school, family relations, judgment, or mood.  See Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 30–32 (4th ed. 1994).

meetings, Dr. Chua prescribed Serzone and Effexor to Plaintiff for his depression.  Tr. at 140, 165.

On October 21, 1998, Dr. Chua determined that Plaintiff was "unable to work at present."  Tr. at 165.  In a follow-up questionnaire dated August 6, 1999, Dr. Chua assessed Plaintiff's mental impairments vis-a-vis work-related activities.  Tr. at 138–43.  First, according to Dr. Chua's analysis, Plaintiff was still hovering around 31 on the GAF scale.  Tr. at 138.  Second, Plaintiff was showing signs of poor memory, appetite and sleep disturbance, personality change, emotional lability, social withdrawal, and decreased energy.  Tr. at 138.  Plaintiff was experiencing a substantial loss of intellectual ability, difficulty thinking or concentrating, feelings of worthlessness and guilt, paranoia or inappropriate suspiciousness, and intrusive recollections of a traumatic experience.  Tr. at 138–39.  Dr. Chua further noted Plaintiff's depression, preoccupation with job-loss, lack of motivation, and forgetfulness as evidence of the severity of plaintiff's mental impairment.  Tr. at 139.  Third, Dr. Chua found in Plaintiff no useful ability to function in semiskilled or skilled work, and an extremely limited ability to perform unskilled work.  Tr. at 141–42.  Fourth, Dr. Chua inferred from past behavior and present symptoms that Plaintiff would be unable to maintain regular attendance–expecting him to miss more than three days of work a month–or to perform within the parameters of a normal workday, workweek, or work setting.  Tr. at 141–42.  Last, Dr. Chua noted that Plaintiff's mental condition did not exacerbate any physical symptoms, e.g., pain.  Tr. at 140.[8]

---

[8]Evidence submitted regarding medical complications arising after the date last insured ("DLI") is irrelevant for two reasons.  First, there is no showing within the record that Plaintiff suffered from rheumatoid arthritis or Raynaud's disease prior to the DLI.  Tr. at 22.  Even if Plaintiff is given the benefit of the doubt that these maladies had been affecting him for four years, as opined by the reviewing physician, Dr. James Wise,
(continued...)

### C. The ALJ's Analysis

The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  The administrative regulations established by the Commissioner require the ALJ to apply a five-step evaluation to determine whether an individual qualifies for disability insurance benefits.  See 20 C.F.R. §§ 404.1520, 416.920; see also Williams v. Apfel, 204 F.3d 48, 48–49 (2d Cir. 1999); Bush v. Shalala, 94 F.2d 40, 44–45 (2d Cir. 1996).

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment which is listed in Appendix 1 of the regulations, [t]he [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

---

[8](...continued)

they would still fall outside the time-status requirements established by 42 U.S.C. §§ 423(a)(1)(A) and 423(c)(1), and 20 C.F.R. §§ 404.130, 404.131(b), and 404.315(a).  Tr. at 22.  Second, neither Dr. Spivack nor Dr. Chua found any physical impairment preventing Plaintiff from maintaining gainful employment, and thus the ALJ correctly determined that Plaintiff did not suffer from a severe respiratory impairment.  Tr. at 40, 145, 166.  Despite the possibility that Plaintiff's PPD conversion was a complicating factor to these recent problems, Dr. Wise did not attempt to establish–or even speculate about–a causal connection between Plaintiff's early TB infection or PTSD and later development of arthritis and Raynaud's.  Tr. at 22.  It would be incorrect to include these later conditions in the present analysis, where they were absent prior to and upon the expiration date of Plaintiff's insured status and where there is no causal connection between the pre-DLI impairments and post-DLI developments.  Therefore, although a party may supplement the record after the ALJ's determination, see Perez v. Chater, 77 F.3d 41, 45 (2d Cir. 1996), the information provided by Dr. Wise is inapplicable.  See also 20 C.F.R. §§ 404.970(b), 416.1470(b).  This medical evidence served its purpose in that it facilitated an extension for Plaintiff to commence the present action.  Tr. at 3.  Beyond that, it is irrelevant.

Barry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).

Prior to applying this five-step framework, the ALJ must determine the date on which the claimant-plaintiff last met the Act's insured status requirement, whereby the claimant must establish disability prior to or on that date last insured.  See 42 U.S.C. §§ 423(a)(1)(A), 423(c)(1); 20 C.F.R. §§ 404.130, 404.131(b), 404.315(a); see also Arnone v. Bowen, 882 F.2d 34, 37–38 (2d Cir. 1989). Here, the ALJ determined that Plaintiff's insured status expired on December 31, 1998, and neither party disputes that finding.  Tr. at 40.

In the first step of the five-step analysis, the ALJ found that Plaintiff had not engaged in substantial gainful employment since October 1, 1997–the date of his alleged onset of disability–and, therefore, moved on to the second step.  At the second step, the ALJ determined that Plaintiff had a severe mental impairment, but found no evidence of a severe respiratory impairment.  In the third step, the ALJ determined that Plaintiff's mental impairment failed to meet or equal the level of severity of any impairment listed in Appendix 1, subpart P, 20 C.F.R. § 404.1520(d), and as a result Plaintiff was not *per se* disabled. Under step four, the ALJ found that Plaintiff retained the residual functional capacity ("RFC") to perform his past relevant work as a maintenance worker and security guard, because these occupations did not impose any productivity demands, significant public contact, or exposure to undue levels of stress.  Having found Plaintiff able to perform his past relevant work, the ALJ concluded his analysis.

## II.      STANDARD OF REVIEW

The court's review of the Commissioner's determination is limited to two inquiries. See 42 U.S.C. § 405(g).  First, the court must determine whether the Commissioner applied the correct legal standard.  See Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Balsamo

v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Cruz v. Sullivan, 912 F.2d 8, 9 (2d Cir. 1990);

Shane v. Chater, 1997 WL 426203, at *4 (N.D.N.Y July 16, 1997) (Pooler, J.) (citing Johnson

v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987)).  Second, the court reviews whether the

Commissioner's findings are supported by substantial evidence within the administrative

record.  See Tejada, 167 F.3d at 773; Balsamo, 142 F.3d at 79; *Cruz*, 912 F.2d at 9;

Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).  A Commissioner's finding will be

deemed conclusive if supported by substantial evidence.  See 42 U.S.C. § 405(g); see also,

Perez, 77 F.3d at 46; Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991).  In the context of

Social Security cases, substantial evidence consists of "'more than a mere scintilla'" and is

measured by "'such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion.'"  Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28

L.Ed.2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S.Ct. 206,

83 L.Ed. 126 (1938)).  Although the reviewing court must give deference to the

Commissioner's decision, the Act is ultimately "'a remedial statute which must be "liberally

applied"; its intent is inclusion rather than exclusion.'" Vargas v. Sullivan, 898 F.2d 293, 296

(2d Cir. 1990) (quoting Rivera v. Schweiker, 717 F.2d 719, 723 (2d Cir. 1983)).

**III.    DISCUSSION**

**A.  Duty to Develop the Record**

Plaintiff first argues the ALJ failed to develop the record and was thus unable to

properly evaluate the plaintiff's mental condition.  The Court agrees.  The ALJ is statutorily

required to develop the record where there is reason to believe more information is

necessary to reach a full decision.  See 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. § 416.912(d)(2).

In the Second Circuit, this requirement rises to an affirmative duty, whereby "'the ALJ, unlike

a judge in a trial, must . . . affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding.'" Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996) (quoting Echevarria v. Secretary of HHS, 685 F.2d 751, 755 (2d Cir. 1982)).  This is the case even if the claimant was represented by counsel.  See Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999).

An ALJ must make every reasonable effort to obtain all medical evidence when evaluating a claim.  See 20 C.F.R. § 404.1512(d)(1).  The phrase "every reasonable effort" means the ALJ is required to make an initial request of the medical source and then, where the source has not complied, make at least one follow-up request and allow for a time extension.  See 20 C.F.R. § 416.912(d)(1); see also Alder v. Apfel, No. Civ. 99-136, 1999 WL 1458368, at *2 (N.D.N.Y. Aug. 13, 1999); Rich v. Apfel, No. Civ. 97-2288, 1998 WL 458056, *11 (S.D.N.Y. Aug. 5, 1998).  Failure by the ALJ to properly supplement the record by making every reasonable effort will warrant remand.  See Schaal v. Apfel, 134 F.3d 496 (2d Cir. 1998).

### 1.  Plaintiff's Physical Condition

The ALJ properly determined that Plaintiff does not suffer from a severe respiratory impairment.  Neither Dr. Spivack nor Dr. Chua's notes support the existence of any physical impairments.  To the contrary, Plaintiff's pulmonary prognoses were consistently good.  Tr. at 152, 166.  Dr. Spivack's final determination was that Plaintiff did not have any definite, documented, or chronic disabling pulmonary limitations, and that there were no physical limitations precluding Plaintiff from working.  Id.  Furthermore, Dr. Chua noted that Plaintiff's mental condition did not exacerbate or affect his physical symptoms.  Tr. at 140.  There is nothing in the record to suggest otherwise.  Therefore,

the Commissioner's finding of no physical impairment was supported by substantial
evidence.

### 2.  Plaintiff's Mental Condition

With respect to Plaintiff's mental condition, the ALJ perceived multiple gaps in the
record that prevented him from making a complete evaluation of Plaintiff's mental disability.
At the hearing, the ALJ noted multiple times the inconsistency of Plaintiff's answers and the
record's lack of clarity.  Tr. at 72.  The ALJ found evidence lacking with respect to Dr. Chua's
post-DLI treatment of Plaintiff, along with multiple unexplained inconsistencies between Dr.
Chua's 1997 and 1999 evaluations.  While initially noting a significant drop in Plaintiff's IQ,
Dr. Chua responded in the negative to a question asking if Plaintiff had experienced a
reduced intellectual functioning.  Tr. at 138, 140.  In 1997, Dr. Chua determined that
Plaintiff's judgment, memory, and insight were unimpaired.  Yet, in 1999, Dr. Chua found
Plaintiff's memory, thought-process, and concentration adversely affected, without
delineating any reasons for the change or any steps taken to treat.  Furthermore, Dr. Chua's
explanations for work-related determinations were shallow and attenuated.  There was no
explanation given for his weighty conclusions and no connection made between his clinical
observations and Plaintiff's probable behavior in a work-related environment.  Lastly, if
Plaintiff had been seen by other physicians since he was diagnosed with PTSD, then the
related medical documentation should have been provided.

Plaintiff claims the ALJ was required to issue subpoenas to fully develop the record.
The Court is not willing to impose that duty on an ALJ where a plaintiff is represented by
counsel and where less burdensome options have not been extinguished.  Under 20 C.F.R. §
416.1450(d), an ALJ "*may*, on his or her own initiative or at the request of a party, issue

subpoenas" to obtain missing documents (emphasis added).  If the Court granted Plaintiff's

contention, the discretionary power given to the ALJ, whereby he may issue subpoenas,

would be rendered a mandatory duty, whereby he must issue subpoenas.  Such a reading

would significantly alter 20 C.F.R. § 416.1450(d).  Outside the context of a *pro se* plaintiff, the

Second Circuit has not recognized a duty to subpoena missing medical information where

the plaintiff has not so requested.  See Perez, 77 F.3d at 47–48; Pratts, 94 F.3d at 37; Jones

v. Apfel, 66 F. Supp.2d 518, 523 (S.D.N.Y. 1999).  Contra Cruz, 912 F.2d at 11 (finding the

ALJ "under a heightened duty 'to scrupulously and conscientiously probe into, inquire of, and

explore for all the relevant facts'" when the plaintiff is unrepresented) (quoting Echevarria,

685 F.2d at 755); Suriel v. Commissioner of Social Security, No. Civ. 05-1218, 2006 WL

2516429, at *4 (E.D.N.Y. Aug. 29, 2006) (finding affirmative duty heightened in cases

involving *pro se* plaintiffs); Jones, 66 F. Supp.2d at 523–24 (raising the affirmative duty in *pro

se* plaintiff cases to a duty to issue and enforce subpoenas to produce evidence).  Had

Plaintiff's counsel sought the ALJ's enforcement of a subpoena, then the ALJ would have

been obliged to do so; but, the ALJ was not individually responsible for issuing a subpoena

where the "every reasonable effort" requirement would have been met by making the

necessary requests, allowing for a time extension, or by ordering a consultative examination.

See 20 C.F.R. §§ 404.1517–404.1519t.

        The ALJ was under a duty to personally request, follow-up the request, and have

Plaintiff's counsel request the missing records from Dr. Chua and the other practitioners.

See 20 C.F.R. §§ 404.1512(d)(1), 404.1593; see also Alder, 1999 WL 1458368, at *2.

Having recognized the deficiencies in the record, he should have cured or attempted to cure

this shortfall.  Although the ALJ initially requested Plaintiff's counsel to obtain additional

records from Dr. Chua and other sources, he made no other attempts to complete the record. At the hearing, the ALJ requested the further records and stated that if these records turned out to be unsatisfactory, he might have to order a consultative exam for Plaintiff.  But the ALJ did not order a consultative exam or otherwise take further efforts to obtain the records.  Had the ALJ taken the requisite steps, he was under a duty to enter such steps into the record. See Suriel, 2006 WL 2516429, at *3; Jones, 66 F. Supp.2d at 524.  His failure to make reasonable efforts to complete the record or sufficiently show that he tried to do so requires this Court to remand to the Commissioner for further development of the evidence.  See Rosa v. Callahan, 168 F.3d 72, 82–83 (2d Cir. 1999); Schaal, 134 F.3d at 505; Pratts, 94 F.3d at 39; Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980); Cutler v. Weinberger, 516 F.2d 1282, 1287 (2d Cir. 1975).

### 3.  Plaintiff's RFC and Past Relevant Work

Plaintiff next contends that the ALJ's failure to rely on a vocational expert's testimony, government-published job data, or other external vocational evidence, when evaluating Plaintiff's mental ability to return to his past relevant work, constituted an error as a matter of law.  The Commissioner counters that the burden here fell on Plaintiff to prove his inability to perform past relevant work, and Plaintiff failed to do so.  The Court agrees with the Commissioner's contention that Plaintiff was responsible for coming forward with and cooperating in the procurement of all material evidence.  See 20 C.F.R. §§ 404.935, 404.1512(a), (c), 404.1516.  However, the ALJ also had an affirmative duty to develop the record to fully and fairly evaluate Plaintiff's RFC in relation to his previous work.

Under the Commissioner's regulations, the ALJ must utilize a "special technique" to determine whether a claimant's mental impairments are severe.  See 20 C.F.R. § 416.920a.

The ALJ, via this technique, rates the claimant's degree of limitation in four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of deterioration or decompensation.  See id.  Based on the rating of each functional category, the ALJ must make a determination of whether the claimant's mental impairment is severe.  See id.

Once the ALJ determines a mental impairment is severe and is not equivalent to any of the enumerated impairments, see Appendix 1, subpart P, 20 C.F.R. § 404.1520(d), then the ALJ must assess the claimant's RFC.  See § 416.920a(d)(3).  The RFC is determined by evaluating both exertional and nonexertional[9] limitations to performing a specific category of work-related activity on a regular and consistent basis.  See 20 C.F.R. §§ 404.1545, 404.1569a, 416.945, 416.969a; see also Martone v. Apfel, 70 F. Supp.2d 145, 150 (N.D.N.Y. 1999).  The RFC is then used to determine if the claimant can do his past relevant work.  See 20 C.F.R. §§ 404.1520(f), 404.1545(a)(5)(i), 404.1560(b).

Where a plaintiff suffers from a severe, but unenumerated, impairment, he has the burden to show he is unable to perform his past relevant work.  See 20 C.F.R. § 404.1520(e); see also Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999); Ferraris v. Heckler, 728 F.2d 582, 584 (2d Cir. 1984).  However, this burden does not remove the ALJ's affirmative duty to develop the record in order to make a comprehensive determination of plaintiff's ability to return to prior work.  See Schaal, 134 F.3d at 505.  "In particular, where the adjudicator is called upon to make a determination of a claimant's [RFC] to perform

---

[9]Nonexertional limitations are restrictions that affect a claimant's ability to meet work-based demands other than sitting, standing, walking, lifting, carrying, pushing, or pulling.  See 20 C.F.R. § 404.1569a.  Such limitations include, but are not limited to, difficulty functioning due to nervousness, anxiety, or depression, difficulty maintaining attention or concentration, and difficulty understanding or remembering detailed instructions.  See id.

gainful employment, he 'must . . . make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC.'" Sobolewski v. Apfel, 985 F. Supp. 300, 314 (2d Cir. 1997) (quoting Social Security Ruling ("SSR") 96-8P, 1996 WL 374184, at *5 (S.S.A.)). The ALJ must be careful when evaluating a claimant's mental impairment "to obtain a precise description of the particular job duties which are likely to produce tension and anxiety . . . in order to determine if the claimant's mental impairment is compatible with the performance of such work."  SSR 82-62, 1982 WL 31386, at *3 (S.S.A.).  Furthermore, since the reaction to the "demands of work (stress) is highly individualized, and mental illness is characterized by adverse responses to seemingly trivial circumstances," even the mental requirements posed by "low stress" jobs must be thoroughly appraised.  SSR 85-15, 1985 WL 56857, at *6 (S.S.A.); see 20 C.F.R. § 416.920a.  In most situations, this appraisal can be based on a combination of the medical evidence and the claimant's own statements regarding his past work requirements and the reasons he is unable to meet those requirements.  See SSR 82-62, 1982 WL 31386, at *3.  In some cases where the claimant's own statements and the medical evidence prove insufficient, the claimant or the ALJ may supplement the record with information provided by relevant employers, vocational experts, or the Dictionary of Occupational Titles.  See id.; see also 20 C.F.R. § 404.1560(b)(2); Bapp v. Bowen, 802 F.2d 601, 606 (2d Cir. 1986).  These external sources can be helpful in assessing the claimant's description of his past work or in responding to hypothetical questions about whether a person with the claimant's medical impairments could meet the demands of the claimant's past relevant work as he performed it or as it is generally performed in the national economy. See 20 C.F.R. § 404.1560(b)(2).

Here, the ALJ evaluated Plaintiff's functional limitations according to 20 C.F.R. §

416.920a and determined Plaintiff's mental impairment to be severe, but not equal to the

level of severity of any listed impairment.  The ALJ then assessed Plaintiff's RFC.  The only

information in the record that explains the duties required by Plaintiff's past relevant work

was supplied by a disability report filled out by Plaintiff.  Tr. at 104–13.  Therein, Plaintiff

stated that as a maintenance worker and security guard he was required to complete reports,

perform light fixing and repairs, and lock-up and check the nursing home grounds.  Tr. at

106.  He was not required to use technical knowledge or skills or supervise other people.

The physical requirements of these occupations required a full day of standing and walking

and frequent lifting of twenty-five pound objects.  Tr. at 106.  Plaintiff also stated he could not

maintain a normal eight hour workday and five day workweek due to his condition.  Tr. at

105.   Based on–and in spite of–this information, in combination with the conclusions made

by Drs. Chua and Spivack, the ALJ found that Plaintiff retained the RFC to perform his past

relevant work, which "imposed no productivity demands, significant public contact or

exposure to undue levels of stress."  Tr. at 43.

Although the ALJ attempted to address the specific mental demands of Plaintiff's

past relevant work, the evidence supplied was insufficient to allow him to fully determine the

extent of Plaintiff's mental disability and RFC in the context of his past relevant work.  On

October 21, 1998, prior to the expiration of Plaintiff's insured status, Dr. Chua determined

Plaintiff was "unable to work at present"; but he failed to provide any basis for this claim.  Tr.

at 165.  This determination and the RFC determinations made post-DLI were

unaccompanied by any explanation for or connection between his clinical observations and

Plaintiff's probable behavior in a work-related environment.  In the ALJ's words: "I can't go on

- 15 -

just that RFC sent in.  That's a [inaudible] statement unless it's backed up with the treatment records.  It has very limited value."  Tr. at 75.  The RFC evaluation was not merely limited in value but also in substance.  There is no discussion of the mental requirements posed or stressful effects caused by Plaintiff's past work.  The other RFC questionnaire in the record was completed by Dr. Spivack and it dealt with Plaintiff's physical (pulmonary) condition, which was deemed non-disabling.  Tr. at 151–55.  Therefore, the record failed to provide a sound foundation from which the ALJ could make a fair determination of Plaintiff's RFC to perform in his past occupations.

Having recognized the limited nature of the RFC evaluations, the ALJ should have sought out Plaintiff, relevant employers, vocational experts, or the Dictionary of Occupational Titles to obtain the necessary supplemental evidence.  See SSR 82-62, 1982 WL 31386, at *3; see also 20 C.F.R. § 404.1560(b)(2); Bapp, 802 F.2d at 606.  His failure to do so warrants remand.

### B.  Treating Physician Rule

Plaintiff's final contention is that the ALJ failed to properly weigh Dr. Chua's opinion as the treating psychiatrist.  In light of the limited amount of information in the record, the Court is unable to determine whether the ALJ afforded the proper amount of deference to the medical determinations made by Dr. Chua as the treating psychiatrist.  For the same reason, the Court is unable to reach the question of whether the ALJ's determination was based on substantial evidence.

Under the "treating physician" rule, a treating physician's opinion must be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case

record."  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); <u>see also</u> <u>Rosa</u>, 168 F.3d at 78 (citations omitted); <u>Schisler v. Sullivan</u>, 3 F.3d 563, 567 (2d Cir. 1993).  However, the ALJ makes the final determination of whether an individual is disabled under the Act.  <u>See</u> 20 C.F.R. § 404.1527(e).  In other words, the ALJ must give controlling weight to a treating physician's medical opinion regarding the nature and severity of an individual's impairments, assuming it is well-supported and consistent with the record; but, the ALJ decides whether an individual is actually disabled.  <u>See</u> <u>id.</u>; <u>see also</u> <u>Snell v. Apfel</u>, 177 F.3d 128, 133 (2d Cir. 1999).  Here, the ALJ refused to give Dr. Chua's opinion controlling weight because his determinations were unsupported by treatment notes or other relevant documentation.  Had the ALJ obtained Dr. Chua's reports and treatment notes, he may have been required to give Dr. Chua's opinion controlling weight.  <u>See</u> <u>Balsamo</u>, 142 F.3d at 81 ("[W]hile an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who [submitted an opinion to or] testified before him.") (alterations in original) (internal quotation marks and citations omitted); <u>McBrayer v. Secretary of HHS</u>, 712 F.2d 795, 799 (2d Cir. 1983) ("The ALJ cannot arbitrarily substitute his own judgment for competent medical opinion.") (citation omitted).

**IV.     CONCLUSION**

In reviewing disability claims, a district court may affirm, modify, or reverse the determination of the Commissioner with or without remanding the case for a rehearing.  <u>See</u> 42 U.S.C. § 405(g).  In this case, the ALJ did not fully discharge his affirmative duty to develop the record and such an omission cannot result in a well-supported finding that

Plaintiff was not disabled under the Act.  Therefore, the Court hereby ORDERS that the case

be remanded to the Commissioner for proceedings consistent with this decision.

IT IS SO ORDERED.

Dated:    August 4, 2007


Thomas J. McAvoy
Senior, U.S. District Judge